UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LARRY D. HARRIS,

                    Plaintiff,

vs.                                                Case No. 11-CV-10318

                                                   HON. GEORGE CARAM STEEH
COUNTY OF SHIAWASSEE,
WILLIAM KNICKERBOCKER,
TERRY KRAMER, BRIAN SHIPMAN,
DINO VILLAREAL, NICOLE REYNOLDS,
SARI LAURER, JERRY CICALO,
JASON DAMERON, JASON
HUTCHINSON, RYAN CONKLIN,
and KIMBERLY MITCHELL,

                    Defendants.
_____/

OPINION AND ORDER
GRANTING DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT [DOC. 27 AND 28]

        Plaintiff alleges that he suffered damages as a result of the inadequate health

care services rendered by defendants while he was a pre-trial detainee of the

Shiawassee County Jail.  The case is presently before the court on motions for

summary judgment filed by defendant Shiawassee County and the individual

defendants who were each sued in their individual capacities.  For the reasons stated in

this opinion, defendants' motions for summary judgment are GRANTED.

FACTUAL BACKGROUND

        Larry Harris was a 48 year old pre-trial detainee of the Shiawassee County Jail in

August 2008. Harris was booked into the Shiawassee County Jail in the early morning

hours of Friday, August 15, 2008 on a charge of civil failure to appear warrant.

Corrections Officer Brian Shipman completed the Inmate Medical Screening at 1:33 a.m.  The Inmate Medical Screening consists of 37 questions, and the CO is required to input each of the inmate's responses into the computer before he or she can move on to the next question.  At the end, the questionnaire is printed for the inmate to review and sign.  Based on Harris' responses, Shipman noted that Harris took medication for high blood pressure, and that a physician had prescribed a salt free diet.  In response to question 11, "Do you currently take any medication prescribed by a doctor?" Shipman noted "Catapress, Zestrol, Hydrochlorside, There is one more for blood pressure but does not remember the name."

Harris described Shipman's questioning as "very persistent", "asking me what types of medications I was taking".  (Harris p. 56).  In response to the following questions, Harris answered "No":

- Have you recently been hospitalized or treated by a doctor?

- Do you have any handicaps or conditions that limit your activity?

- Do you have any other medical problems we should know about?

- Do you have a heart condition?

- Do you have any condition other than what I have mentioned that we should know about?

Harris signed the Inmate Medication Screening after it was printed.

Harris did not have any of his medication with him when he was picked up and taken to the jail.  He informed CO Shipman that he last took his prescribed blood pressure medications at 9:30 p.m. on August 14, 2008, shortly before he was arrested.

2

(Harris p. 52, 173).  These were his last pills and he needed to refill his prescriptions the next day.

Nurse Mitchell worked Friday, August 15, 2008, on the day shift, the day Harris was booked in.  She reviewed Harris' Inmate Medical Screening.  With regard to Harris' allegation that she did not properly set up his medications on Friday, she testified:

> [O]ne, if he would have brought [his medications] in or had someone bring them in to them, we would have set them up.  We would have allowed him to have those.  Two, normally, if they do take their medications, as he stated in [question] 27, they're not – the majority of hypertensive people would not – how can I say that? – crash and burn after two days.  It wouldn't be an emergent situation without going with their medication for two days.

(Mitchell p. 80).  Question 27 asked, "Do you have high blood pressure?"  Harris answered "Yes", and the notes state "takes meds."

Nurse Mitchell was asked why she did not attempt to obtain Harris' meds, or contact his physician, or find out the dosages, given that he stated he had high blood pressure and listed several blood pressure medications.  Mitchell responded that she would not do any of these things because the medications would not arrive until Monday, and the inmate might have bonded over the weekend anyway.  (Mitchell p. 78).

At 2:30 a.m. on Sunday, August 17, 2008, Harris began to experience intense chest pain, which he described as "10 out of 10."  Harris tried to get the attention of the corrections officers as they made their cell check rounds, but no one acknowledged him.  At 6:30 a.m. breakfast was served by an inmate trustee and a CO.  Harris claims he informed the CO of his condition, but could not recall the identity of the officer.  According to Harris, CO Knickerbocker was the "guy who finally paid me some attention

3

and listened to what I had to say." (Harris p. 112). At 9:15 a.m., CO Knickerbocker took Harris' blood pressure, which registered as 210/138. Sgt. Kramer ordered CO Reynolds to dispatch ambulance transport. EMS paramedics recorded blood pressure readings of 210/138, 186/144, and 184/140. Paramedic Johnson characterized the readings as "dangerously high" and opined that such readings would put a patient "at risk for having a stroke." (Johnson, p. 30, 37).

Harris entered triage in the Emergency Department of Memorial Hospital at 10:00 a.m. with the following history:

> Pt. states CP (chest pain) started at approx. 2:30 this am . . . 10:22 pt given morphine 4 mg pain still "10".

Harris underwent cardiac catheterization surgery which revealed total occlusion of the right coronary artery, a 60-70 percent mid left anterior descending artery blockage, and a 60-70 percent circumflex coronary artery blockage. Harris was transferred to Sparrow Hospital in Lansing, where he underwent triple bypass surgery on August 18, 2008.

<u>Shiawassee County Jail</u>

Shiawassee County Jail has a capacity of 130 inmates. In August 2008, inmate health care was provided by one full time nurse, Kimberly Mitchell, RN, who worked Monday through Friday from 8:00 a.m. to 5:00 p.m. Access to a medical physician was limited to Tuesdays and Thursdays when Dr. Strong would be present in the jail.

Nurse Mitchell testified that on weekends, health care decisions were left to the discretion of corrections officers. (Mitchell p. 82). Jail Administrator Douglas Powell testified that health care decisions on weekends were made by Jail Supervisors based upon common sense. (Powell p. 28). It was Nurse Mitchell's job to verify, order and

4

"set up" inmate medications to be administered four times per day on the day shift. Medications brought in with inmates at the time of booking were given to the nurse for verification and dispensation based upon daily dosage. Medications brought to the jail after the nurse's shift were left for the nurse along with the Inmate Medical Screening Form to be set up by the nurse during normal working hours.

SJI Policy Directive 10.8 Administration of Medication, provides inmates booked into the jail with medications, but when the nurse was off duty, would receive their medications only for medical conditions "designated by the jail physician. Examples: heart problems, seizure control, diabetes, high blood pressure." Shiawassee County Jail had no written policy for procurement of prescription medications for inmates booked into the jail after hours without their prescription medications. The jail relied upon a practice of CO's advising the inmate to call a family member to bring medications to the jail for processing by the jail nurse. (Powell, p. 75).

Administrator Powell testified that absent written policies, the jail relied upon common sense of custodial staff regarding administration of blood pressure medications for inmates booked on weekends without their prescription medications. (Powell, p. 45).


Harris' Medical History

Harris had complained of chest pain to his doctors in the weeks leading up to his incarceration. (Harris p. 109-110). Sparrow Hospital records state "Pt. describing frequent episodes of chest pain for last 6 months with worsening episode for the last 3 to 4 weeks". Harris did not report any prior chest pain or heart conditions to CO Shipman when he was booked.

5

Harris' medical history indicates significant complaints of lower back pain in the years leading up to his 2008 arrest. In the year immediately leading up to his arrest, Harris reported to his doctor every three weeks to obtain a 30-day prescription of Norco, a narcotic pain reliever. Harris did not report his back pain or his Norco prescription when he was booked in.

Harris visited his primary care physician Jeffrey Hoffa, D.O., on July 28, 2008. The record of this visit indicates Harris received a Norco prescription, but does not indicate a prescription for his blood pressure medications. Harris' blood pressure reading on that date was 140/80. Three weeks earlier, on July 7, 2008, Harris reported to Dr. Hoffa, received a Norco prescription, and had a blood pressure reading of 180/110.

Dr. Hoffa's records contain a Michigan Automated Prescription System record, which shows each time Harris had a medication prescription from Dr. Hoffa's office filled or refilled from 2007 through 2008. The record indicates plaintiff refilled his Norco prescription at various locations usually every three weeks. The record does not show plaintiff ever refilling his blood pressure medications. The only evidence of blood pressure medications being provided to Harris are Dr. Hoffa's records that show he was provided 30 hydrochlorothiazide pills on April 18, 2008, 60 Catapress pills in January 2008, 60 tenormin pills in January after his Catapress was discontinued, and 30 hydrochlorothiazide pills in November 2007. Each time Harris was provided with blood pressure medication, he was also given a prescription and refills for the medication. There is no evidence that Harris ever filled any of the blood pressure prescriptions.

6

Harris claims that as a result of his incarceration and defendants' deliberate indifference in not providing him his blood pressure medications, he suffered pain and had to undergo triple bypass surgery.

<u>STANDARD FOR SUMMARY JUDGMENT</u>

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  <u>See</u> <u>Redding v. St. Eward</u>, 241 F.3d 530, 532 (6th Cir. 2001).  The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice.  The procedure is not a disfavored procedural shortcut.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 327 (1986); <u>see</u> <u>also</u> <u>Cox v. Kentucky Dept. of Transp.</u>, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" <u>Amway Distributors Benefits Ass'n v. Northfield Ins. Co.</u>, 323 F.3d 386, 390 (6th Cir. 2003) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party.  <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>Redding</u>, 241 F.3d at 532 (6th Cir. 2001).  "[T]he mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u>

7

issue of <u>material</u> fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986)

(emphasis in original); <u>see</u> <u>also</u> <u>National Satellite Sports, Inc. v. Eliadis, Inc.</u>, 253 F.3d

900, 907 (6th Cir. 2001).

 If the movant establishes by use of the material specified in Rule 56(c) that there

is no genuine issue of material fact and that it is entitled to judgment as a matter of law,

the opposing party must come forward with "specific facts showing that there is a

genuine issue for trial." <u>First Nat'l Bank v. Cities Serv. Co.</u>, 391 U.S. 253, 270 (1968);

<u>see</u> <u>also</u> <u>McLean v. 988011 Ontario, Ltd.</u>, 224 F.3d 797, 800 (6th Cir. 2000).  Mere

allegations or denials in the non-movant's pleadings will not meet this burden, nor will a

mere scintilla of evidence supporting the non-moving party.  <u>Anderson</u>, 477 U.S. at 248,

252.  Rather, there must be evidence on which a jury could reasonably find for the non-

movant.  <u>McLean</u>, 224 F.3d at 800 (citing <u>Anderson</u>, 477 U.S. at 252).

<u>ANALYSIS</u>

I. <u>Individual Defendants</u>

 A.  <u>Count I - Deliberate Indifference to Serious Medical Needs</u>

 42 U.S.C. § 1983 provides for a cause of action against any person acting under

color of state law who subjects "any citizen of the United States or other person" to a

deprivation of the rights secured by the Constitution or federal laws.  <u>Chapman v.</u>

<u>Houston Welfare Rights Org.</u>, 441 U.S. 600, 617-18 (1979).  A plaintiff must produce

sufficient evidence establishing that (1) a right secured by the Constitution or a federal

statute has been violated, and (2) the violation was committed by a person acting under

color of state law.  <u>West v. Atkins</u>, 487 U.S. 42, 48 (1988).  However, the doctrine of

8

qualified immunity will preclude such claims if the "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. 223, 231 (2009).

As a pretrial detainee, Harris' substantive federal right to adequate medical care was guaranteed by the Due Process Clause of the Fourteenth Amendment.  Spears v. Ruth, 589 F.3d 249, 254 (6th Cir. 2009).  The Sixth Circuit has held that the standard for medical care under the Due Process Clause of the Fourteenth Amendment is essentially the same as the standard guaranteed to convicted prisoners by the Eighth Amendment.  See Jones v. Muskegon County, 625 F.3d 935, 941 (6th Cir. 2010).  Both the Eighth and Fourteenth Amendments prohibit deliberate indifference to a prisoner's serious medical needs.  Spears, 589 F.3d at 254.

In order for Harris to succeed on his first count, he must show that he had a serious medical need, and that defendants, being aware of that need, acted with deliberate indifference toward the need.  Wilson v. Seiter, 501 U.S. 294, 300 (1991).  There is an objective and subjective element to a claim of deliberate indifference.  Comstock v. McCray, 273 F.3d 693, 702 (6th Cir. 2001).  The objective component requires admissible evidence that the medical need is sufficiently serious, and is satisfied "[w]here the seriousness of a prisoner's need[] for medical care is obvious even to a lay person."  Blackmore v. Kalamazoo County, 390 F.3d 890, 899 (6th Cir. 2004).

The Sixth Circuit has held that when an inmate complains about a delay in medical treatment in an Eighth Amendment situation, the inmate must have corroborative medical evidence in the record to demonstrate the detrimental effect of

9

the delay in medical treatment.  Napier v. Madison County, Ky, 238 F.3d 739, 742-43 (6th Cir. 2001).  In this case, Harris claims that the two day delay in receiving his blood pressure medications cause the blockages in his arteries that resulted in his triple bypass surgery.  Harris admitted in his deposition that he does not have any medical evidence to connect his alleged injury (surgery) to the alleged constitutional violation (not receiving blood pressure medications).  (Harris dep. p. 124-129).

The Napier holding was modified in part by Blackmore v. Kalamazoo County, 390 F.3d 890 (6th Cir. 2004), which held that "verifying medical evidence" is relevant to those claims involving minor maladies or non-obvious complaints of a serious need for medical care.  "Napier does not apply to medical care claims where facts show an obvious need for medical care that laymen would readily discern as requiring prompt medical attention by competent health care providers."  Id. at 898.

The subjective component to a deliberate indifference claim provides that an official cannot be found liable for denying an inmate medical care "unless the official knows of and disregards an excessive risk to inmate's health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  The conduct for which liability attaches must demonstrate deliberateness equivalent to an intent to punish.  Horn v. Madison County Fiscal Court, 22 F.3d 653, 660 (6th Cir. 1994).

As a subjective test, personal liability of any of the defendants must be based solely on the individual actions of each defendant in the situation that the particular defendant faced.  Gibson v. Matthews, 926 F.2d 532, 535 (6th Cir. 1991).  A claimed

10

constitutional violation must be based upon active unconstitutional behavior. <u>Greene v.</u> <u>Barber</u>, 310 F.3d 889, 899 (6th Cir. 1999).  "The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act." <u>Summers</u> <u>v. Leis</u>, 368 F.3d 881, 888 (6th Cir. 2004).

      1. <u>Corrections Officer Defendants</u>

      (a) <u>Brian Shipman</u> - Officer Shipman was the booking officer who took Harris' Inmate Medical Screening.  Harris described Shipman as "very persistent" in trying to determine Harris' medical history.  Harris explained that he was particularly concerned about making sure that the officer knew he was taking four different blood pressure medications, and that he needed to have the prescriptions refilled.  This information was recorded on the Inmate Medical Screening.  Harris answered "no" to the question whether he suffered from any heart or other condition.  CO Shipman had no other interaction with Harris.

      (b) <u>Secundino Villareal</u> - this corrections officer's only interaction with Harris was to transport him from the holding cell to Cell 19 on the evening of August 15, 2008.  Harris testified that he did not have any conversation with Villareal, nor was he complaining of chest pain at the time.  (Harris p. 82).  This was Harris' only interaction with CO Villareal.

      (c) <u>Jason Dameron</u> - Officer Dameron did not work at the jail at any time during Harris' 2008 incarceration.  (Dameron p. 33-38).

(d)  Jason Hutchinson - Officer Hutchinson did not have any direct contact or interaction with Harris.  Harris testified, "I'm implying that, and I believe, I can't say for sure, but I believe it was Hutch that kind of blew me off the morning hours. . . . Because he's arrogant and really doesn't care about anybody in that jail." (Harris p. 112-13).  When asked if he had any independent recollection of Officer Hutchinson being near his cell and ignoring him, Harris answered, "Can't say.  I can't say."  (Harris p. 113).  CO Hutchinson was only in the back cellblock from 7:00 to 10:00 p.m. on August 16, well before Harris began to experience chest pain.  (Hutchinson p. 33-34).

(e)  Jerry Cicalo - Officer Cicalo testified he did not have any contact with Harris during his limited shifts on August 15 and 16.

(f)  Ryan Conklin - Officer Conklin was responsible for the back cellblock from 2:00 a.m. until 6:00 a.m. on August 17.  Conklin testified that if Harris had made a complaint to him about having chest pains, he would have transported him to the front cellblock and indicated as much in the log.  There is no reference to complaints made by Harris in the log from August 17, 2008.  (Conklin p. 66-67).

(g)  Sari Lauer (Colbry) - Officer Lauer had limited contact with Harris during the four hours she worked in the back cellblock on August 16, 2008 from 10:00 p.m. until 2:00 a.m.  During this period, Harris was not complaining of or experiencing chest pain.  (Colbry p. 29, 32, 37-42, 51-52).

12

(h)  Nicole Reynolds - Officer Reynolds had limited contact with Harris during the morning of August 16, 2008,  when Harris was not complaining of or experiencing any pain.  On August 17, 2008, at 6:00 a.m., Reynolds was working in the front cellblock.  Reynolds contacted central dispatch on behalf of Harris, per Officer Kramer's orders.  (Reynolds p. 9-15; Incident Report).

(I)  William Knickerbocker - Officer Knickerbocker provided medical attention to Harris shortly after starting his shift on August 17, 2008 at 6:00 a.m.  In response to Harris' complaint of chest pain at 9:00 a.m., Knickerbocker brought Harris to the front cellblock, contacted his supervisor, and checked Harris' vitals, waiting to see if Harris needed CPR before the ambulance arrived.  (Knickerbocker p. 75-76).  This was his only contact with Harris.  (Knickerbocker p. 58).

(j)  Terry Kramer - Officer Kramer had limited contact with Harris on August 16, 2008, when Harris was not complaining of or experiencing chest pain.  (Kramer p. 46).  On August 17, 2008, in his role as supervisor, Kramer contacted central dispatch for an ambulance after Harris was brought to the front cellblock and had his vitals checked by Knickerbocker.  (Kramer p. 51-52).

Prior to experiencing chest pain in the jail, Harris contends that every time his cell door opened for food to be delivered, three times a day each day he was in the jail, he would ask the officer delivering the food if they had his medications.  (Harris p. 93-94, 99-100).  High blood pressure is not a condition where the need for medical care is

13

readily discernable to a layman.  Therefore, without additional evidence that Harris was suffering any malady requiring medical attention, the CO's were entitled to ignore his requests for medication and rely on the decision of the jail's medical staff.

On Sunday, August 17, around 2:30 a.m., Harris claims he felt dizzy and experienced chest pain that he rated a 10 out of 10.  According to Harris, each time an officer walked by his door, which was at least once an hour, he would pound on the door and try to get the officer's attention.  Harris describes his cell as having a door with a small hole in it which allowed his voice to be heard in the outside hall, as well as two windows which were not in the door.  Harris sat on the cell bench in front of the windows and when he saw a CO in the hallway he would pound on the door or windows.  (Harris p. 107, 117-18).  According to Harris, sometimes the CO would smirk and keep walking by, and sometimes the CO would listen to Harris and tell him, "You'll have to speak to the nurse when she comes on duty."  (Harris p. 108).

Harris explains that while lights are out, if an inmate is out of his bed he will be taken to the holding cell.  (Id. p. 106-08).  Harris describes himself not only as being out of bed, but as pounding on the door of his cell, yet he was not removed from his cell.  In addition there are no notations of complaints or disturbances caused by Harris in the CO logs.  The CO's all deny being aware of Harris trying to get their attention prior to 9:00 a.m.  Harris claims he told the officer who delivered his breakfast that he was having chest pains, that he felt dizzy, and that he needed his medications.  (Id. at 111). Harris was not able to identify any of the CO's by name or physical appearance, not even remembering if the CO he first told of his chest pain was a male or female officer. The only officer Harris could identify was Officer Knickerbocker, who responded by

14

providing Harris with medical attention when he became aware of Harris' complaints of chest pain at 9:00 a.m.

Many of the corrections officers testified to having general knowledge that hypertension is a medical need that could be life threatening.  (Shipman p. 65; Colbry p. 20; Kramer p. 38; Villareal p. 15; Cicalo p. 10).  Knickerbocker testified that when an inmate complains of chest pain, the protocol is to take them to the holding cell to be checked out because a CO does not have the medical training to determine if the situation is serious.  (Knickerbocker p. 69).

Harris argues that each of the officers on duty between 2:30 a.m. and 9:00 a.m. on August 17 is liable for deliberate indifference to his serious medical needs because none of them responded appropriately to his complaints.  Taking Harris' description of his condition and his physical appearance as accurate, his need for medical care during this time period might have been obvious to a layperson.  However, there must be some credible evidence that the individual officers actually knew of Harris' complaints.  There is no such evidence in the record of this case, until Officer Knickerbocker responded at 9:00 a.m.  Harris has not produced any evidence that any of the defendant officers were actually aware of Harris having a serious medical need and, in spite of that knowledge, ignored his complaints.  The claims against the individual officer defendants are dismissed.

        2.  <u>Nurse Kimberly Mitchell</u>

Nurse Mitchell reviewed Harris' Inmate Medical Screening on Friday, August 15, 2008.  Based on the information provided by Harris, that he had been taking blood pressure medications and did not suffer from any other medical conditions, Mitchell

relied on her twenty plus years of medical experience to determine that waiting two days over the weekend would not cause Harris to "crash and burn." (Mitchell p. 81). Mitchell made no effort to provide Harris his prescription medications, and did not speak to either Harris or his family regarding his medications. (Mitchell p. 77). Mitchell believed that if she had ordered Harris' medications on Friday, they would likely not have arrived until Monday anyway. (Mitchell p. 78).

Harris points to Mitchell's deposition testimony, "I know that he needed his meds" (Mitchell p. 105), to create a question of fact regarding what she was aware of or should have been aware of. This statement was Mitchell's explanation for why she wrote "No meds brought in to nurse office ? Bond" on the Inmate Medical Screening. When asked what the "?" meant, Mitchell explained that it meant she was not sure if Harris would be bonded out over the weekend, or if he had been to court on the issue of bond. (Id.). Harris acknowledged that she was considering Harris' need for meds so it was relevant to her whether or not he was going to be bonded out. Mitchell's testimony is not that she believed he needed his meds over the weekend, but rather if Harris was going to be in jail following the weekend, he would need his meds, and Mitchell was not sure about Harris' jail status in this regard.

Harris was not experiencing any pain or exhibiting outward signs of distress from the time he was booked into the jail on August 15, 2008 at 1:33 a.m. until the morning of August 17, 2008. Harris was not unconscious and did not have visible signs of trauma, illness or pain at intake. Harris indicated only that he had high blood pressure, and that he had taken his medication shortly before his arrest. Harris did not indicate he suffered

16

from a heart condition, or any other medical condition.  Nurse Mitchell made a medical decision that Harris could wait through the weekend to obtain his medications.

Harris later testified that when he was booked he had high cholesterol, but he did not indicate this information to the booking officer.  Harris was also taking the pain medication Norco, but he did not relate this to the booking officer either.  Norco is a narcotic drug, and discovery reveals that Harris had been consuming a potentially excessive quantity during the months preceding his incarceration.  This information would have concerned Nurse Mitchell since Harris could have suffered from withdrawal in the jail.

Harris has presented no evidence that he suffered a heart attack or stroke, only that he had high blood pressure and felt chest pain.  None of the medical records indicate Harris had a heart attack.  Narcotic withdrawal can cause chest pain, while high blood pressure typically does not.  (Mitchell Affidavit).  Triple bypass surgery is the result of long-term problems, and is not resolved by the administration of blood pressure medication.  (Mitchell Affidavit).

Harris did not experience chest pain or demonstrate any physical signs of distress until 2:30 a.m. on August 17, 2008.  Nothing about his situation prior to this time would make it obvious to a lay person that Harris needed medical attention.  Harris has not presented any evidence that not having his medications for two days caused his chest pain, or the need for bypass surgery.  Nor is there evidence that having his medications would have prevented the chest pain or the need for bypass surgery.

Harris has not provided any evidence demonstrating deliberate indifference by Nurse Mitchell, or by the individual CO's.  The individual defendants' motion for

17

summary judgment is granted as to Count I, deliberate indifference to serious medical needs.

C.  Count II - Gross Negligence

In Count II, Harris asserts a state law claim for gross negligence against all individual defendants.  The incident occurred on or about August 15, 2008.  Harris filed his initial complaint on January 29, 2011, and added new defendants on August 15, 2011.  Defendants contend that the statute of limitations for any claim against a corrections officer is two years:

> A person shall not bring or maintain an action to recover damages for injuries to persons or property unless, after the claim first accrued to the Plaintiff or to someone through whom the Plaintiff claims, the action is commenced within the periods of time prescribed by this section.

M.C.L. § 600.5805(1).

> The period of limitations is 2 years for an action against a sheriff charging misconduct or neglect of office by the sheriff or the sheriff's deputies.

M.C.L. § 600.5805(7).  Harris argues that this case is not against the sheriff or sheriff's deputies, so the limitations period is three years:

> The period of limitations is 3 years after the time of the death or injury for all other actions to recover damages for the death of a person, or for injury to a person or property.

M.C.L. § 600.5805(10).

Regardless of whether the two or three year statute of limitations applies to plaintiff's state law claim of gross negligence against the individual defendants in this case, the court finds plaintiff has not presented sufficient evidence of gross negligence to avoid summary judgment.  The Michigan Legislature has defined gross negligence as

18

"conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results."  MCL 691.1407(2); <u>Harris v. University of Michigan Bd of Regents</u>, 219 Mich.App. 679, 694; 558 NW2d 225 (1996).  Gross negligence requires more than ordinary negligence, and evidence of ordinary negligence alone is insufficient to avoid summary judgment.  <u>Maiden v. Rozwood</u>, 461 Mich. 109, 121-122; 597 NW2d 817 (1999).  For the same reasons the court concluded the individual defendants were not deliberately indifferent to Harris' serious medical condition, it also concludes they did not demonstrate a substantial lack of concern for whether an injury resulted to Harris.

Summary judgment is granted to defendants on Harris' gross negligence count.

II.  <u>Shiawassee County</u>

Shiawassee County Sheriff's Department jail policy 10.8 addresses "Administration of Medication" and provides that each new inmate is to be asked whether they are taking any prescribed medication.  If the inmate answers in the affirmative, officers are directed to ask appropriate follow-up questions "as listed and documented on the MEDICAL SCREENING FORM."  The eight questions are as follows:

1) What is the name of the medication(s)?
2) What is the medication for?
3) How is the medication taken?
4) Who prescribed the medication?
5) When did he/she take the last dosage?
6) When are you supposed to take the next dosage?
7) Is this a current medication?
8) Any history of problems taking this medication?

(Policy 10.8, p. 3).

19

Officer Lauer described the practice employed when an inmate took medications but did not bring them to the jail:

A.      I don't know if there was a written policy, no.

* * *

A.      If the person was diabetic, insulin dependent diabetic, high blood pressure, heart medication, we would ask them to call their family, or we would call them to get the medication.

* * *

Q:      What you're saying is there would be an effort to try to get those medications from either a family member, through the inmate himself, or through the actions of a corrections officer, correct?

A:      Yes.

(Colbry p. 18-20).

Harris' claim against the County is brought pursuant to Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658 (1978) and its progeny, which provides for municipal liability under 42 U.S.C. § 1983 only if the injuries alleged are inflicted pursuant to the municipality's policy or custom.  The policy must be "the moving force of the constitutional violation."  Id. at 694.  The plaintiff must identify the policy, connect the policy to the county itself and show that the particular injury was incurred because of the execution of that policy.  Board of County Comm'rs v. Brown, 520 U.S. 397, 403-04 (1997); Garner v. Memphis Police Dept., 8 F.3d 358, 364 (6th Cir. 1993).  A municipality can be held liable for inadequate training under § 1983 only where the failure to train amounts to deliberate indifference to the rights of persons with whom its officers come into contact.  City of Canton v. Harris, 489 U.S. 378, 388 (1989).  The failure to train must reflect the deliberate or conscious choice by a municipality.  Id. at 389.  Once the policy is identified, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the

20

municipal action and the deprivation of federal rights." Board of County Comm'rs v. Brown, 520 U.S. 397, 403-04 (1997).

With regard to municipal liability in the context of constitutional violations based upon deliberate indifference to serious medical need, the Sixth Circuit holds that "liability can arise and deliberate indifference can be shown by proof that the . . . county "knows that inmates face a substantial risk of serious harm and disregards the risk by failing to take reasonable measures to abate it." Blackmore, 390 F.3d at 900 (citing Farmer, 511 U.S. at 847 (1970)).

Harris points to testimony from Lt. Douglas Powell, Shiawassee County Jail Administrator, whose duties include drafting jail policies.  Powell knew that hypertension "could cause life threatening conditions" yet in 2008 the County had no specific guidelines relating to treatment of inmates with hypertension.  (Powell p. 46). Shiawassee County did have a written policy covering medications, including provisions for determining, setting up, and dispensing medications, as well as requiring CO's to follow up with medical staff with further concerns.  (Policy 10.8, p. 5).  Other policies covered determination of health care needs of inmates, including health appraisals within fourteen days of booking, procedures for transfer of inmates with emergency needs, and medical screening.  (Policies 10.4, 10.5, and 10.6).

The policy or practice that Harris alleges caused deliberate indifference to his serious medical needs is the lack of a policy which would provide medications to inmates suffering hypertension on weekends.   As the County points out, however, Harris was not an inmate entering the jail without his blood pressure medications on a weekend.  Contrary to Harris' argument, there was a written policy, the written policy

21

was followed, and there was a decision made by a health care professional regarding Harris' medications.  Nurse Mitchell decided that Harris would not receive his medications over the weekend based on his answers on the Medical Inmate Screening and her medical training.

Harris presents evidence that health care services at the Jail were privatized in February 2009, when the County retained the service of Health Professionals, Limited (HPL).  (Powell p. 14).  Onsite nursing coverage was then increased from 40 to 60 hours per week, and was provided for the first time on Saturdays.  (Powell p. 15-16).  HPL had its own policies and procedures, including one for hypertension which provided that at intake an initial blood pressure should be obtained.  "If the patient's blood pressure is elevated and medications cannot be verified, contact the physician on call for medication orders."  (HPL Clinical Protocols: Hypertension).  The fact that the County contracted with an outside company to provide additional nursing coverage more than a year after Harris was a pretrial detainee in the jail cannot be construed as demonstrating an unconstitutional municipal policy.  The Ninth Circuit case cited by plaintiff is distinguishable because that case involved evidence of other similar actions occurring after the lawsuit was filed to show that the defendant county was aware of the alleged abuse and allowed it to continue after being put on notice.  The Ninth Circuit held such evidence could be used to show a county policy permitting abuse to occur. Henry v. County of Shasta, 132 F.3d 512, 519 (9th Cir. 1997).  The Sixth Circuit has not followed Henry, nor are the facts of this case similar.  See Cross v. City of Detroit, 2008 U.S. Dist. LEXIS 23779 (E.D. Mich., Mar. 26, 2008).

Harris also claims municipal liability for an alleged failure by the County to follow its own policy. Specifically, that the follow-up questions regarding medications, listed in Policy 10.8, are not identified on the medical intake questionnaire. However, Harris himself testified that Shipman "was very persistent about asking me what types of medications I was taking . . . I explained to him everything I took, and he punched it into the computer." (Harris p. 56). The fact that the follow-up questions are not specifically identified on the questionnaire does not matter considering Harris was actually asked follow-up questions regarding his medications. A violation of internal policy is not the equivalent of a constitutional violation. See Smith v. Freland, 954 F.2d 343, 347-48 (6th Cir. 1992); Washington v. Starke, 855 F.2d 346, 350 (6th Cir. 1988).

Harris next argues that the failure to have a written policy regarding complaints of chest pain or high blood pressure is evidence of deliberate indifference. The testimony of the officers refutes the inference that complaints of chest pain are ignored because there is no written policy. The testimony in the record shows the County had a custom and practice to provide immediate care and treatment for inmates who complained of chest pain. (Colbry p. 50; Conklin p. 66-67, 79; Knickerbocker p. 68-69; Reynolds p. 29-30; Shipman p. 62-63).

Even if post-event incidents are admissible to prove the existence of a policy, or a municipality's policies or customs are constitutionally deficient, see, Wilson v. Morgan, 477 F.3d 326, 340 (6th Cir. 2007), or even if the County failed to follow its own policies, where there is no constitutional violation by an individual, there can be no municipal liability. In this case, Nurse Mitchell did not execute her duty to Harris with deliberate indifference to a serious medical need. She made a professional determination, based

23

on a review of the information provided by Harris (which did not include the fact that he had a heart condition, recently experienced chest pain, was under a doctor's care, had high cholesterol, suffered from an aortic aneurysm, or that he regularly consumed large doses of prescription narcotics), that Harris was in no danger spending two days without his blood pressure medications.

A thorough review of the evidence presented by Harris reveals no evidence that the CO defendants were inadequately trained by the County in responding to an inmate's serious medical needs.

This claim is also subject to summary judgment because of a complete absence of medical evidence to support a causal connection between Harris' alleged chest pain, and subsequent bypass surgery, with plaintiff's high blood pressure condition. Harris presented no medical evidence to support his claim regarding a failure to respond, nor has Harris responded to contrary evidence that his chest pain was more likely a result of the fact that he was suffering pain resulting from withdrawal from his pain medication.

<u>CONCLUSION</u>

For the reasons given in this opinion and order, defendants' motions for summary judgment are GRANTED.

Dated:  June 28, 2012

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on June 28, 2012, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk

---